# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE TONGE, on behalf of herself and all others similarly situated <br> Plaintiff, <br><br> v. <br><br> FUNDAMENTAL LABOR STRATEGIES, INC. <br> Defendant. | CIVIL ACTION <br> No. 16-6310 |

MCHUGH, J.                                                                                      September 29, 2017

## MEMORANDUM

This is a putative class action on behalf of job applicants who claim that Defendant Fundamental Labor Strategies ("FLS") violated their rights under the Fair Credit Reporting Act ("FCRA") when they applied for trucking jobs. The sole named Plaintiff is Christine Tonge. She alleges that FLS violated the FCRA first when it requested her consumer report after obtaining her consent on an inadequate disclosure form, and then a second time when it denied her job application based on the report's contents without first giving her a copy of the report, a summary of her FCRA rights, and a chance to discuss and dispute the report's contents, which she believes to be inaccurate. Defendant now moves to dismiss Tonge's Amended Complaint for lack of subject matter jurisdiction based on Article III standing, relying on *Spokeo, Inc. v. Robins*. 136 S. Ct. 1546 (2016), as revised (May 24, 2016). I reject FLS's reading of *Spokeo*, because the Third Circuit has made clear that *Spokeo* reaffirmed traditional notions of standing and neither established a new standard nor erected new barriers for standing. Accordingly, and for reasons set forth below, Defendant's Motion is denied.

## I. Background

The parties agree on most of the facts in this case. Plaintiff Tonge is a truck driver with more than a decade of experience. She applied for a position through Defendant FLS, a placement company that hires commercial truckers and outsources them to companies in need of drivers. She began by completing FLS's online application, including agreeing to allow FLS to run her driving record. It is FLS's policy not to hire drivers with more than two "chargeable" (*i.e.*, preventable) accidents in the last three years.

Tonge then took a road test and attended an in-person interview.[1] At the interview, she completed FLS's version of a FCRA Disclosure and Release (the "Consent Form"), purportedly agreeing to allow FLS to obtain a consumer background check that would include her consumer credit history, criminal history, and driving history. ECF No. 21-2, Ex. 3 ("Background Inquiry Release"). In addition to disclosing the kind of background check FLS planned to conduct, the Consent Form included a description of Tonge's rights under the FCRA—but both parties agree that it did not accurately describe her FCRA rights:

> If FLS plans to use any information from a credit report in connection with a decision not to hire me or to make any other adverse employment decision regarding me, it will provide me with a copy of the credit report upon which its decision was based and a written summary of my rights under the [FCRA].[2]

A mailing address for FLS appeared at the bottom of the form.

Some time later, Tonge called FLS to check on the status of her application. An FLS

---

[1] These face-to-face interactions with FLS before it requested a background report are significant because they removed Tonge's application from a FCRA exception that limits the disclosure rules for certain trucking applications completed entirely by phone, mail, or online. *See* § 1681b(b)(2)(B)–(C). FLS agrees that the exception did not apply to Tonge's application. Def.'s Mot. Dismiss 19, ECF No. 21-1.

[2] It is undisputed that this sentence contained at least two inaccuracies: it referenced a "credit report" instead of a "consumer report," and, more importantly, stated that Tonge would have a right to a copy of the report only *after* FLS had taken an adverse action (*i.e.*, denied her application), when in fact the FCRA guaranteed Tonge the right to see and dispute the report *before* FLS denied her application.

representative told her that the application had been denied based on the contents of her background report—specifically, the presence of three accidents within the last three years, which made her ineligible under FLS's rules. In the following days, Tonge obtained a copy of the consumer report on which FLS had based its decision. The report came from a consumer background check company called HireRight, Inc. and contained several pieces of negative information about Tonge's former employment at Kreilkamp Trucking ("Kreilkamp").[3]

HireRight reported that Tonge had been in three accidents while at Kreilkamp and was "discharged." Tonge believed (and continues to allege) that this information was inaccurate, and she contacted HireRight to dispute it. HireRight notified FLS that Tonge was disputing her employment history, and provided FLS with a corrected report, changing Tonge's reason for leaving Kreilkamp from "Discharged" to "Resigned/Quit." According to FLS, HireRight did not amend the accident history or make any other changes to the report.

Apart from these facts, on which there is agreement, there are two main points on which the parties disagree. Although I find neither material to the standing question before me, I highlight them because the parties—especially FLS—place great weight in them. First, Tonge insists that the accidents listed in the HireRight report did not occur. Pl.'s Resp. Def.'s Mot. Dismiss 7 [hereinafter "Pl.'s Resp."], ECF No. 24. FLS, relying on the modified HireRight report, asserts that they did. Def.'s Mot. Dismiss 5–6; HireRight Email to FLS (June 21, 2016), ECF No. 21-2. Second, the parties dispute whether FLS gave Tonge a verbal summary of her FCRA rights. Tonge contends that she was never given any verbal summary of her rights and that she only learned she could dispute the report through a conversation with a colleague. Pl.'s Resp. 7; Tonge Decl. ¶¶ 5–9, ECF No. 24-1. FLS, on the other hand, asserts that its

---

[3] Plaintiff has initiated a separate lawsuit in New Jersey against HireRight and Kreilkamp, alleging FCRA and defamation claims. *See Tonge v. Kreilkamp Trucking*, No. 2:16-CV-09267 (D.N.J. Dec. 15, 2016).

representative gave Tonge a verbal "summary of her rights" before requesting the report. Def.'s Mot. Dismiss 4–5 (citing Brangan Decl. ¶ 4, ECF No. 21-3). But assuming that any oral summary matched the language of FLS's written Consent Form, it would necessarily include a statement of Tonge's rights that the parties agree was incorrect. FLS also avers that the same representative, after telling Tonge by phone that her application had been denied, gave her "oral notification" of HireRight's contact information, further advising that HireRight had not taken adverse action against her, and that she could get a free copy of the report and dispute its contents. But, as explained below, no summary of rights (verbal or written) provided by FLS *after* it denied Tonge's application could fulfill its obligations under FCRA. FLS does not argue otherwise. I recognize that these are disputed facts but reiterate that they do not affect my analysis.

## II. The Fair Credit Reporting Act

In 1970, as the emergence of computer technology created the possibility of "a nationwide data bank covering every citizen," Congress enacted the FCRA to ensure that the growing credit reporting industry would be "fair and accurate." *See* Fair Credit Reporting Act § 1681, 15 U.S.C. §§ 1681–1681x (1970); S. Rep. No. 91-517, at 2 (1969) [hereinafter "Senate Report"]; *Spokeo*, 136 S. Ct. at 1545. To achieve this goal, Congress created protections for consumers and imposed obligations on credit reporting agencies and employers (among others) to ensure that they "me[t] the needs of commerce" in a way that was "fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy, and proper utilization of [consumer credit] information." § 1681(b); S. Rep. No. 103-209, at 2 (1993). In the FCRA, Congress intended to create a law that "acknowledge[d] both the utility and dangers of the credit reporting industry." *Id.* at 3. In light of the law's "consumer oriented objectives," the Third

Circuit has held that the FCRA is "undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 722 (3d Cir. 2010).

Two separate FCRA protections are at issue in this case. Section 1681b(b)(2)(A), establishes that a person or entity may not procure a consumer report[4] for employment purposes unless:

> (i) a *clear and conspicuous* disclosure has been made in writing to the consumer at any time before the report is procured . . . in a document that consists *solely* of the disclosure, that a *consumer* report may be obtained for employment purposes; and (ii) the consumer has authorized in writing . . . the procurement of the report by that person.

§ 1681b(b)(2)(A) [hereinafter, the "disclosure requirement"] (emphasis added to highlight the deficiencies alleged here). The second, Section 1681b(b)(3)(A), provides that:

> [I]n using a consumer report for employment purposes, *before* taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates (i) a *copy* of the report; and (ii) a *description in writing of the rights* of the consumer [to obtain and dispute information in the report].

§ 1681b(b)(3)(A) [hereinafter, the "pre-adverse action requirement"] (same emphasis added) (referencing § 1681g(c)'s summary of rights requirements). The "clear purpose" of this section is to ensure that applicants and employees have the opportunity to "discuss reports with employers or otherwise respond before adverse action is taken" against them. *Goode v. LexisNexis Risk & Info. Analytics Grp.*, 848 F. Supp. 2d 532, 537 (E.D. Pa. 2012). An "adverse action" includes denying an employment application. § 1681a(k)(1)(B)(ii). The Consumer Financial Protection Bureau (CFPB) published a model summary of consumers' rights under the

---

[4] As it relates to this case, the FCRA defines a consumer report as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used…in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for…employment purposes." § 1681a(d)(1)(B).

FCRA which employers must use to satisfy this requirement.[5]

To enforce these substantive protections, Congress imposed civil liability on employers and any other person who violates the FCRA. Any person who willfully or recklessly fails to comply with the FCRA is liable to the consumer for the greater of any actual damages or statutory damages of $100 to $1,000. § 1681n(a)(1)(A); *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57–58 (2007) (holding that the civil liability imposed by the FCRA for willful noncompliance also extends to reckless violations of the law).

### III. Tonge's Claims and the Putative Classes

Plaintiff Tonge brings claims on behalf of herself and two putative classes. She alleges that FLS violated both of the FCRA protections set out above: Section 1681b(b)(2)(A)(i)'s disclosure requirement (Count One), and Section 1681b(b)(3)(A)'s pre-adverse action requirements (Count Two). Am. Compl. ¶¶ 3–6, 43–44, ECF No. 18. These protections, Tonge alleges, are intended to protect consumers' private, sensitive information and ensure that they are informed of their rights to control the dissemination and dispute the contents of their consumer reports.[6] *Id.* ¶¶ 3–6, 9.

---

[5] Congress required the administrative agency in charge of implementing the FCRA to create a model summary of rights, and the FCRA requires employers to provide that document to applicants. *See* §§ 1681b(b)(3)(A)(ii); 1681g(c)(1)(A). Currently, the Fair Trade Commission and the CFPB share enforcement duties for the FCRA, and interpretation and regulatory duties—including the creation of the rights summary at issue here—are assigned to the CFPB. *See* § 1681s(a)(1); Fair Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act (2011), *available at* https://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations. The CFPB's "A Summary of Your Rights Under the Fair Credit Reporting Act" is readily available online in multiple languages. *See* http://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf.

[6] FLS takes issue with the fact that Tonge's Amended Complaint did not explicitly allege violations of her right to privacy and right to certain information, and insists that I must therefore disregard Tonge's subsequent arguments about privacy and informational harms as a basis for standing. *See* Def.'s Reply Supp. Mot. Dismiss 2–3 (hereinafter "Def.'s Reply"), ECF No. 25 (referring to argument in Pl.'s Resp. at 10, 12–13). However, Tonge specifically alleged that FLS violated her rights under two FCRA provisions, and that the purpose behind those provisions was to protect consumers' "right to privacy,"

Specifically, Count One alleges that FLS's disclosure did not comply with the FCRA because it was not contained within a single, standalone document. Tonge argues that the request for permission to pull her driving record on the initial application effectively spread FLS's disclosure and release across two documents. *Id.* ¶¶ 23–25. In addition, she alleges that FLS's Consent Form was not "clear and conspicuous" because it contained an extraneous sentence falsely stating Tonge's rights under the FCRA (*i.e.*, that she could obtain a copy of the "credit" report and a summary of her FCRA rights *after* FLS took any adverse action based on it, when in fact the parties agree that the FCRA guaranteed Tonge those rights *before* any adverse action).[7] *Id.* ¶¶ 26–27. Finally, Tonge alleges that the inclusion of the "Bill and Mail to:" language, accompanied by a mailing address, further muddied the form. *Id.* ¶¶ 28–29. Tonge asserts Count One on behalf of herself and the putative "Improper Disclosure Class," which she defines as "All prospective employees of FLS in the United States who were the subject of a consumer report that was procured (or caused to be procured) by FLS . . . from five (5) years prior to the filing of this until the date of final judgment in this action." *Id.* ¶ 57.

Count Two alleges that FLS violated the FCRA by denying her employment application (an "adverse action" under the FCRA) without following the law's pre-adverse action

---

make them "aware of their ability to control and correct the information" in their consumer reports, and to "ensure that consumers are informed of their rights to dispute." Am. Compl. ¶¶ 5–6, 9–10, 43–44. I find that these allegations satisfy Federal Rule of Civil Procedure 8(a)(2) as applied in *Bell Atlantic Corp. v. Twombly* because they give FLS "fair notice" of the nature and basis of Tonge's claims, which include violations of her rights to privacy and to certain information. *See* 550 U.S. 544, 554–55 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). FLS's focus on Tonge's allegation that she suffered damages in the form of lost employment opportunity and financial and mental anguish is misplaced. *See* Def.'s Reply 2. I construe these damages allegations as just that—alleged damages—and not as the entirety of Tonge's alleged legal harms. So while FLS is correct that a "complaint may not be amended by the briefs in opposition to a motion to dismiss," Tonge's Amended Complaint adequately alleges privacy and informational harms without further amendment. *See id.*

[7] Tonge does not assert that FLS had a duty to address in the initial disclosure her right to see and dispute the report (her pre-adverse action rights). Rather, she asserts that FLS's inclusion of a false statement of her pre-adverse action rights in the initial disclosure rendered the disclosure unclear. *See* Pl.'s Resp. 1–2.

requirements. Tonge alleges (and FLS does not dispute) that FLS denied Tonge's application without giving her a copy of the consumer report on which they had relied, or providing a written summary of her FCRA rights and the opportunity to dispute the report's contents. *Id.* ¶ 81–82. Tonge asserts this count on behalf of herself and the putative "Adverse Action Class," defined as: "All prospective employees whom FLS took adverse action against by denying them employment with FLS, based in whole or in part, on information contained in a consumer report . . . from five years prior to the filing of this [sic] until the date of final judgment in this action." *Id.* ¶ 57.

### IV. FLS's Standing Challenge

Defendant FLS moves under Rule 12(b)(1) to dismiss Tonge's claims for lack of subject matter jurisdiction, arguing that she has no Article III standing. FLS asserts that Tonge has failed to prove each of the three elements of standing: injury in fact, causation, and redressability. Def.'s Mot. Dismiss 9, 21, 23. Injury in fact is the core of FLS's challenge, and will likewise be the primary focus of my discussion. *Id.* at 2.

FLS insists that any FCRA violations it committed were "mere technical" or "bare procedural" violations of the law and that those violations caused Tonge no concrete harm. *Id.* at 15–19. Invoking cases from Texas and New Jersey, FLS asserts that "a statutory right to information is substantive" whereas "[a] statutory right to receive that information in a particular format is procedural" and suggests that Tonge suffered no concrete harm because she received all the information she was entitled to, even if by means not sanctioned by the FCRA. *Id*. at 15. Finally, in both its injury in fact and causation arguments, FLS insists that its alleged FCRA violations did not alter the ultimate outcome of Tonge's applications; FLS's compliance with the law, FLS asserts, would not have changed Tonge's decision to go forward with the application

and "would have had no bearing on whether FLS decided to hire [her]." *Id.* at 16, 19, 22.

As a backstop, FLS also recites a brief argument focusing on redressability. FLS suggests that, if Tonge were to be awarded statutorily damages (in the amount of $100 to $1,000 per violation), "[s]uch relief surely would not satisfy the injuries described in her Amended Complaint." FLS devotes less than a page to this argument and I will invest a similar level of effort in rejecting it. In essence, FLS argues that the FCRA's statutory damages are too low to adequately compensate prospective employees for FCRA violations, with the result that Tonge lacks an essential element of standing to bring a FCRA claim. Without presuming to critique the adequacy of the statutory damage amounts Congress set in the FCRA, I reject FLS's reasoning, as it would undermine huge swaths of legislation and jurisprudence that establish, endorse, or rely on statutory damages—consumer protection, constitutional law, copyright law, traffic regulation, and contract law, to name a few.[8]

FLS describes its standing challenge under Rule 12(b)(1) as a factual, rather than facial, attack. *See id.* at 8. The nature of a jurisdictional challenge determines the relevant standard of review. Whereas a court reviewing a facial attack must consider the complaint's allegations as true and "in the light most favorable to the plaintiff," a factual attack enables the court to "consider evidence outside the pleadings" and resolve any "disputed material facts" in order to evaluate the jurisdictional claim. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358–59 (3d Cir. 2014).

As explained above, FLS has not provided evidence outside of the pleadings to dispute any fact material to the question of whether Tonge has standing. The evidence FLS presented—including its application documents, two affidavits, the HireRight consumer report on Tonge,

---

[8] Not only are statutory damages entrenched in our current legal system, but there are substantive societal benefits—including fairness, predictability, deterrence, and systemic cost savings—to their use. *See* Samuel L. Bray, *Announcing Remedies,* 97 CORNELL L. REV. 753, 755–56 (2012).

and an email from HireRight documenting her dispute—largely admit the allegations of Tonge's complaint. *See* ECF Nos. 21-2, 21-3. FLS agrees that it uses the Consent Form Tonge identified, that its application process is generally as Tonge described, and that Tonge did not receive a copy of the report or a summary of her rights under FCRA before her application was denied. FLS does dispute the contents of its post-adverse action phone conversations with Tonge and the accuracy of the contents of her consumer report. But here, where Tonge has alleged violations of two FCRA sections intended to ensure consumers' access to certain information and to protect their privacy, these facts are not material to whether Tonge and the putative classes have adequately alleged an injury in fact.

I acknowledge that whether FLS's challenge is facial or factual depends on which view of the law I adopt. If I were to adopt the Defendant's view of standing for FCRA claims, facts relevant to the question of concrete harm could include the accuracy of the underlying accidents and whether an opportunity for Tonge to view and dispute her report pre-adverse action would have altered FLS's decision not to hire her. But, as explained below, I do not believe that standing law in the Third Circuit supports FLS's view, which hinges on economic harm and whether the FCRA violation would have unquestionably altered the ultimate outcome of the plaintiff's employment application. As I see the law, it makes no difference which standard applies because the parties agree on all relevant facts. *See Stokes v. Realpage, Inc.*, No. CV 15-1520, 2016 WL 6095810, at *4 (E.D. Pa. Oct. 19, 2016) (Padova, J.) ("Since, in the materials outside of the pleadings . . . Defendant's factual material essentially admits certain of the allegations of the Complaints relevant to the standing issue . . . there is no need to weigh these facts . . . and we thus merge our discussion of the facial and factual attacks.").

## V. Standing and *Spokeo*

A plaintiff has standing to invoke the jurisdiction of a federal court when she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 Sup. Ct. at 154. When, as here, a case is at the pleading stage, the plaintiff must "'clearly allege facts demonstrating' each element." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The standing requirements are the same for individual plaintiffs and those seeking to represent a class. *Id.* at 1547 n.6. In addition to the redressability argument I dismissed above, FLS asserts that Tonge suffered no injury in fact—the "first and foremost" element of standing.[9] *Id.* To establish injury in fact, Tonge must show that she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560). It is the concreteness of Tonge's injury that FLS disputes.

Specifically, FLS argues that under *Spokeo*, job applicants like Tonge, who have not shown that an alleged FCRA violation definitively altered the outcome of their application, lack standing to challenge that violation. I reject FLS's argument because I am not persuaded that *Spokeo* altered the constitutional standing requirement. *See* 136 S. Ct. at 1549.

In *Spokeo*, the Supreme Court addressed a standing challenge in the context of a claim arising under a different part of the FCRA. Plaintiff there brought claims against an online "people search engine" for publishing inaccurate—but not inherently negative—information about him, including that he was employed, affluent, and married with children, when in fact, he

---

[9] FLS also challenges causation—asserting that Tonge "cannot demonstrate a causal connection between her alleged injury and FLS's conduct"—but this argument is so closely tied to FLS's injury in fact argument that I address them together. *See* Def. Mot. Dismiss 21–22. Both arguments hinge on the nature of Tonge's alleged injury, which I define differently than FLS.

was unemployed, not wealthy, single, and had no children. *Id.* at 1546. He alleged that the search engine had violated several sections of the FCRA, including a requirement that consumer reporting agencies follow reasonable procedures to assure the accuracy of consumer reports, but made no allegation that the false information had actually been used against him. *Id.* at 1545. Finding that the lower court had failed to parse the particularity and concreteness requirements, the *Spokeo* Court remanded to the Ninth Circuit for a decision on whether the plaintiff had suffered a concrete injury,[10] *id.* at 1545, and in the process discussed important considerations for standing in the context of statutory violations, *id.* at 1548–50.

The Court first explained that because standing is a constitutional requirement, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Thus, standing "requires a concrete injury even in the context of a statutory violation." *Id.* at 1547–49. But a concrete harm, the Court emphasized, need not be tangible. *Id.* at 1549 ("Although tangible injuries are perhaps easier to recognize . . . intangible injuries can nevertheless be concrete."). And while a "bare procedural violation, divorced from any concrete harm" will not confer standing, "the violation of a procedural right granted by statute can be sufficient" to show an injury in fact without the plaintiff alleging "any additional harm beyond the one Congress identified." *Id.* at 1549.

To parse these subtle distinctions—a "bare procedural violation" compared with a "the violation of a procedural right" and intangible injuries that can nonetheless be concrete—*Spokeo* identified two important considerations: history and the judgment of Congress. To decide whether an intangible injury arising from a statutory violation is sufficiently concrete, *Spokeo* explained that it is "instructive to consider whether an alleged intangible harm has a close

---

[10] On remand, the Ninth Circuit had "little difficulty concluding that these interests protected by FCRA's procedural requirements [were] 'real,' rather than purely legal creations" and found that the plaintiff's allegations thus gave rise to standing. *Robins v. Spokeo*, 867 F.3d 1108, 1114 (9th Cir. 2017).

relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* And because Congress is "well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Id.* ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" and thus "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate"). *Spokeo* gave one example of a procedural violation that would not, in and of itself, amount to a concrete harm: an inaccurate zip code with no other allegations of harm. But aside from that illustration, the Court chose not to define the contours of a "bare procedural violation," explicitly expressing "no view" on whether any other kind of false information would, without more, be actionable. *Id.* at 1550 n.8.

The Third Circuit has applied *Spokeo* on three occasions, holding each time that the decision did not alter the standing analysis in this Circuit. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 273 (3d Cir. 2016); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638–39 (3d Cir. 2017); *Sussino v. Work out World, Inc.*, 862 F.3d 346, 352 (3d Cir. 2017).

In *Nickelodeon*, a putative class action on behalf of children whose online browsing habits had been collected by defendants in violation of a federal privacy law, the Third Circuit reaffirmed its pre-*Spokeo* holding that a plaintiff need not allege any economic harm to have standing. *See Nickelodeon,* 827 F.3d at 273 ("[W]hen it comes to laws that protect privacy, a focus on 'economic loss is misplaced.' Instead, in some cases an injury in fact 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.' . . . [*Spokeo*] does not alter [this] analysis." (quoting *In re Google Inc. Cookie Placement Consumer Privacy*

*Litig.*, 806 F.3d 125, 134 (3d Cir. 2015))). *Nickelodeon* also provided important clarity on which intangible harms create standing. "Harms that 'may be difficult to prove or measure,' such as unlawful denial of access to information subject to disclosure" can constitute concrete injury for standing, the Court explained. *Id.* at 273–74 (citing *Spokeo*, 136 S.Ct. at 1549).

Just a few months later, the Third Circuit relied on *Nickelodeon* when it found standing in a FCRA case, explaining that the decision had provided "welcome clarity" on a previously murky issue. *See Horizon,* 846 F.3d at 636. Whereas previous Third Circuit law "had not been entirely consistent" on whether "a breach of a statute [was] enough to cause a cognizable injury," *Nickelodeon* was "decidedly in favor of allowing individuals to sue to remedy violations of their statutory rights, even without additional injury," the *Horizon* Court announced. *Id.* at 635. *Horizon* found that the plaintiffs had alleged a concrete injury where the defendant health insurance company's FCRA violations led to their personal information being stolen from its laptops, even though there was no evidence that the thieves had used their information improperly. *Id.* at 629. The Court emphasized that the "[i]njury-in-fact element is not Mount Everest" and that, "while not precisely defined," it is "very generous." *Id.* at 633.

In reaching its conclusion, the *Horizon* Court explained that "the Supreme Court has repeatedly affirmed the ability of Congress to 'cast the standing net broadly' and to grant individuals the ability to sue to enforce their statutory rights" and that *Spokeo* did not change that. *Id.* at 635 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998)). *Spokeo* did not raise the bar to standing in the Third Circuit: "In the absence of any indication to the contrary, we understand that the *Spokeo* Court meant to reiterate traditional notions of standing, rather than erect any new barriers that might prevent Congress from identifying new causes of action

though they may be based on intangible harms."[11] *Id.* at 638.

What *Spokeo* did do, *Horizon* explained, was create two benchmarks to consider in determining when intangible injury can be "concrete" for standing purposes. The first—that of history—asks whether the alleged intangible harm is "closely related" to a harm traditionally recognized by the courts; however, the alleged injury need not actually give rise to a common law cause of action. *Id.* at 637–39. (In *Horizon*, the Court found that the alleged violation related to traditional invasion of privacy.) The other benchmark considers whether Congress has "expressed an intent to make an injury redressable." *Id.* at 637. FCRA violations meet this second benchmark, the Court held, because Congress created a private right of action to enforce the FCRA and "even allowed for statutory damages for willful violations—which clearly illustrates that Congress believed that the violation of FCRA causes a concrete harm to consumers." *Id*. at 639.

*Horizon* acknowledged *Spokeo*'s observation that, under certain circumstances, "mere technical violation of a procedural requirement" would not alone be an injury in fact. But just as the Supreme Court chose not to define the contours of "those limiting circumstances," the Third Circuit likewise declined to consider them. *Id*. at 638.

Most recently, the Third Circuit reaffirmed its interpretation of *Spokeo* in *Sussino,* 862 F.3d 346. In *Sussino*, where the plaintiff alleged a violation of the Telephone Consumer Protection Act after she received an unsolicited phone call with a one-minute voicemail, the defendant company argued that she had suffered no concrete injury. To frame its analysis, the *Sussino* Court summarized *Horizon*'s rule as follows: "When one sues under a statute alleging 'the very injury [the statute] is intended to prevent,' and the injury 'has a close relationship to a

---

[11] The *Horizon* Court explicitly rejected reading into *Spokeo* the requirement that a plaintiff show that the alleged statutory violation caused a material risk of harm. *Id.* at 637–38.

harm . . . traditionally . . . providing a basis for a lawsuit in English or American courts,' a concrete injury has been pleaded." *Id.* at 351 (quoting *Horizon*, 846 F.3d at 639–40). The Third Circuit concluded that the *Spokeo* considerations are not exhaustive: "We do not, and need not, conclude that intangible injuries falling short of this standard are never concrete…we simply observe that all intangible injuries that meet this standard *are* concrete." *Id.* at 351 (emphasis in original) (citing *Horizon*, 846 F.3d at 638). Applying this rule, the *Sussino* Court found standing because a single unwanted phone call was "the very harm that Congress sought to prevent" in passing the law, and American courts have traditionally protected privacy interests. *Id.*

### VI. Tonge's Claims Satisfy Both of *Spokeo*'s Benchmarks

Guided by the Third Circuit's interpretation of *Spokeo* in *Nickelodeon*, *Horizon*, and *Sussino*, I find that Tonge's claims easily meet both benchmarks—that of history and of congressional intent.[12] First, Tonge's allegations that FLS asked her to sign an inadequate form (which, among other allegations, falsely stated her FCRA rights) and then failed to provide her with any notice at all of her pre-adverse action rights are, in and of themselves, the "very injury that FCRA is intended to prevent." *See Horizon*, 846 F.3d at 640. Her allegations align not only with Congress's broad FCRA goal of ensuring fairness and accuracy in the credit reporting industry, but also with the specific goals of the FCRA protections at issue, each carefully tailored to curb documented risks and abuses in the credit reporting industry. *See* § 1681(b); Senate Report at 3 ("One problem,"—the first of seven Congress identified—"is the inability at times of the consumer to know he is being damaged by an adverse credit report . . . Unless a person knows he is being rejected for . . . employment because of a credit report, he has no opportunity

---

[12] I note that the parties' otherwise thorough briefing of this Motion was done without the benefit of *Sussino*, which was published in July 2017, and at least one relevant District Court case. *See Daniels v. Solomon*, CV 17-0757, 2017 WL 3675400 (E.D. Pa. Aug. 25, 2017), *appeal docketed*, No. 17-3017 (3d Cir. Sept. 18, 2017).

to be confronted with the charges against him and tell his side of the story."). That Congress created a private right of action, in addition to agency enforcement powers, is further evidence of its belief that "the violation of FCRA causes concrete harm to consumers." *See* § 1681n; *Horizon*, 846 F.3d 625 at 639. As to the second benchmark, Tonge's alleged violations of her substantive rights to privacy and to statutorily-mandated information are closely related to long-established causes of action.

A recent (post-*Spokeo*) opinion from the Eastern District of Virginia, *Thomas v. FTS USA, LLC*, sets out a comprehensive statutory history of the FCRA and, specifically, the congressional intent motivating the disclosure and pre-adverse action provisions at issue here. *See* 193 F. Supp. 3d 623, 631–38 (E.D. Va. 2016). *Thomas* also provides a thorough overview of how the informational and privacy harms alleged, although not independently actionable pre-FCRA, closely align with well-established causes of action in U.S. courts. *See id*. I adopt the standing analysis from *Thomas* in its entirety.[13]

In reaching my conclusion, I was not persuaded by FLS's "all's well that ends well" philosophy. FLS asks me to find that Tonge has no standing if she cannot prove that the Consent Form's alleged inadequacies definitively altered her decision making—in other words, that she would have refused a background check if the disclosure had been FCRA-compliant. FLS likewise argues that Tonge has not alleged a concrete injury because she has not proven that, had she been afforded her pre-adverse action rights, FLS would have decided to hire her instead.

---

[13] *Thomas* has already been cited with approval three times by courts in this Circuit that found standing in FCRA cases where plaintiffs alleged no harm beyond the statutory violation. *See Wright v. Lincoln Prop. Co.*, No. 15-CV-3483, 2017 WL 386602, at *4 n.3 (E.D. Pa. Jan. 27, 2017); *Miller v. Trans Union, LLC*, No. 3:12-CV-1715, 2017 WL 412641, at *1 (M.D. Pa. Jan. 18, 2017) (relying heavily on *Thomas's* reasoning and analysis of the FCRA legislative history to find standing based on informational injury); *Stokes*, 2016 WL 6095810 at *4 (citing with approval the legislative history of the FCRA as set out in *Thomas* to show that Congress intended for the FCRA to establish new, legally cognizable rights to information).

Again, FLS insists that, whether or not Tonge was informed of and had a chance to exercise her FCRA rights, she would have ended up without a job anyway. But this is a distortion of the plaintiff's burden that overlooks congressional intent and does not honor the standing doctrine.

As *Spokeo* explained, the standing doctrine developed to ensure that the judiciary does not "usurp the powers of the political branches"—it is ironic then, when defendants seek to use the doctrine to undermine the plain text of a statute by asking the court to refuse to recognize the actionable harms Congress identified. *See* 136 S. Ct. at 1547. When Congress enacted the FCRA, it identified harmful practices in the credit reporting industry and elevated those harms to cognizable legal injuries that align with historical causes of action. *See generally* Senate Report at 2–4 (explaining that the FCRA would establish safeguards against the problems posed by the credit reporting industry, including that "highly sensitive and personal information" in credit reports could "invade the individual's right to privacy," and that consumers had a "right to know" when they were being denied employment because of information in their credit report). Congress then empowered the private bar and individual consumers to enforce its mandate. Any action by the judiciary that undermines the vitality of that critical enforcement mechanism would also undermine the goals of the statute. This incursion into the legislative domain is precisely the judicial intrusion the standing doctrine seeks to prevent.

Even if I had the ability to predict that FLS would ultimately be proven right about the fate of Tonge's application, she still would have been deprived of information to which she was statutorily entitled, including an accurate description of her rights. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982) ("testers" denied truthful housing information had suffered an injury in fact, even though they had no intention of actually renting or buying a home, because their statutory right to truthful information about available housing had been

violated, creating standing to bring a claim for violation of the Fair Housing Act). I do not believe that Congress, in enacting the FCRA, intended to inform consumers of their rights only if the information would unequivocally avoid financial harm to those consumers. In this view, I join the Third Circuit and my Eastern District colleagues. *See Nickelodeon,* 827 F.3d at 273; *Horizon,* 846 F.3d at 638–39; *Sussino*, 862 F.3d at 352; *Wright*, No. 2017 WL 386602, at *4 n.3 (Pratter, J.) (rejecting employer's standing argument that plaintiff applicant could not recover under the FCRA for the employer's failure to give a pre-adverse action report and notice of rights because the convictions that formed the basis for the adverse decision were accurate); *Daniels*, 2017 WL 3675400, at *3 (holding that plaintiff had demonstrated a concrete injury in the context of the Fair Debt Collection Practices Act, another remedial statute, where she alleged a statutory violation without additional injury).[14]

Accordingly, I find that when an applicant alleges that she consented to a background check based on an unclear disclosure, and was denied employment without an opportunity to learn her pre-adverse action rights, view the background check report, or dispute it, she alleges exactly the kind of harms against which Congress sought to protect.

It is clear to me that Congress, in enacting the FCRA, intended to create substantive rights to privacy and to certain statutorily-mandated information, regardless of whether a consumer's knowledge of that information would certainly alter the ultimate trajectory

---

[14] I do not see my decision as inconsistent with *Long v. SEPTA*, which FLS cites at length. *See* Def.'s Reply 1, 3, 5. *See Long v. Se. Pa. Transp. Auth.*, No. 16-CV-1991, 2017 WL 1332716, at *4 (E.D. Pa. Apr. 5, 2017). In *Long*, plaintiff job applicants did not receive adequate disclosures or pre-adverse action notices, and SEPTA went on to deny their applications. *Long* acknowledged that "*Spokeo* did not change the requirements to establish Article III standing," but held that the allegations were examples of the "bare procedural violations" referenced in *Spokeo*, and found no concrete injury. *Id.* at *4. There are two significant distinctions between *Long* and the case before me: (1) the *Long* Court found that the plaintiffs had not pled privacy or informational injuries; and (2) the *Long* plaintiffs had disclosed their criminal convictions, the basis for SEPTA's decision not to hire them, *before* SEPTA requested their background reports—this second point was central to the Court's holding. *Id.*

(economic or otherwise) of a given interaction between the consumer and an employer or credit reporting agency.  Accordingly, I find that Tonge has adequately alleged injuries in fact so as to give rise to standing.

                 <u>     /s/ Gerald Austin McHugh</u>
                 United States District Judge